**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IBOLYA NAGY,** | |
| *Plaintiff,* | Civil Action No. 14-4502 |
| v. | OPINION |
| | August 14, 2015 |
| **CAROLYN W. COLVIN,** | |
| **Acting Commissioner of Social Security,** | |
| *Defendant.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE.**

Before this Court is Ibolya Nagy's ("Plaintiff") request for review, pursuant to 42 U.S.C. §§ 1383(c)(3), 405(g), of the Commissioner of Social Security Administration's ("Commissioner") decision with respect to Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income Benefits (collectively, "Disability Benefits"). Plaintiff argues in the alternative that: (1) the Commissioner's decision should be reversed with an award of benefits because there is substantial evidence in the record to support a finding of disability; and (2) the numerous deficiencies in the Commissioner's decision require the case to be remanded for reconsideration. For the reasons set forth in this Opinion, the Court finds that this matter must be **REMANDED**.

1

I. STANDARD OF REVIEW AND APPLICABLE LAW

   A. Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if there exists substantial evidence to support the decision. 42 U.S.C. § 405(g); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003). Substantial evidence, in turn, "means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). Stated differently, substantial evidence consists of "more than a mere scintilla of evidence but may be less than a preponderance." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).

"[T]he substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Accordingly, the standard places a significant limit on the district court's scope of review: it prohibits the reviewing court from "weigh[ing] the evidence or substitut[ing] its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Therefore, even if this Court would have decided the matter differently, it is bound by the ALJ's findings of fact so long as they are supported by substantial evidence. Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (quoting Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001)).

In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider: "(1) the objective medical facts; (2) the diagnoses of expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and

neighbors; and (4) the claimant's educational background, work history, and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973).

### B. The Five-Step Disability Test

In order to determine whether a claimant is disabled, the Commissioner must apply a five-step test. 20 C.F.R. § 404.1520(a)(4). First, it must be determined whether the claimant is currently engaging in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as work activity, both physical and mental, that is typically performed for either profit or pay. 20 C.F.R. § 404.1572. If it is found that the claimant is engaged in substantial gainful activity, then he or she is not disabled and the inquiry ends. Jones, 364 F.3d at 503. If it is determined that the claimant is not engaged in substantial gainful activity, the analysis moves on to the second step: whether the claimed impairment or combination of impairments is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). The regulations provide that an impairment or combination of impairments is severe only when it places a significant limit on the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimed impairment or combination of impairments is not severe, the inquiry ends and benefits must be denied. Id.; Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 196 (3d Cir. 2007).

At the third step, the Commissioner must determine whether there is sufficient evidence showing that the claimant suffers from a listed impairment or its equivalent. 20 C.F.R. § 404.1520(a)(4)(iii). If so, a disability is conclusively established and the claimant is entitled to benefits. Jones, 364 F.3d at 503. If not, the Commissioner must ask at step four whether the claimant has residual functional capacity ("RFC") such that he is capable of performing past relevant work; if that question is answered in the affirmative, the claim

3

for benefits must be denied. Id. Finally, if the claimant is unable to engage in past relevant work, the Commissioner must ask, at step five, "whether work exists in significant numbers in the national economy" that the claimant is capable of performing in light of "his medical impairments, age, education, past work experience, and 'residual functional capacity.'" 20 C.F.R. §§ 404.1520(a)(4)(iii)-(v); Jones, 364 F.3d at 503. If so, the claim for benefits must be denied. The claimant bears the burden of establishing steps one through four, while the burden of proof shifts to the Commissioner at step five. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Under 42 U.S.C. § 405(g) and Third Circuit precedent, this Court is permitted to "affirm, modify, or reverse the [Commissioner's] decision with or without a remand to the [Commissioner] for a rehearing." Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984); Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 865-66 (3d Cir. 2007). While an outright reversal with an order to award benefits is permissible in the presence of a fully developed record containing substantial evidence that the claimant is disabled, the Court must order a remand whenever the record is incomplete or lacks substantial evidence to justify a conclusive finding at one or more of the five steps in the sequential analysis. See Podedworny, 745 F.2d at 221-22.

## II. BACKGROUND

### A. Procedural History

This case arises out of Plaintiff's application for disability insurance benefits and supplemental security income filed on June 15, 2011. Tr. 16, 22, 133-43. In both applications, the claimant alleged a disability beginning on February 3, 2009. Tr. 22. Both claims were denied initially on October 18, 2011, whereupon claimant filed a written

4

request for an administrative hearing.  Tr. 22.  The claimant appeared and testified at the hearing on August 6, 2012, in front of The Honorable John J. Barry ("The ALJ").  Tr. 22.  On January 28, 2013, the ALJ decided that the claimant was not disabled during the relevant time period, because although she could no longer perform her past work, jobs existed in significant numbers in the national economy that Plaintiff could perform.  Tr. 22-35.  Plaintiff then sought review before the Appeals Council, which was denied on May 30, 2014.  Tr. 1.  Having exhausted her administrative remedies, Plaintiff subsequently timely filed the instant action on July 16, 2014.

### B. Factual Background

#### 1. Plaintiff's History of Physical Impairments

Plaintiff is a 54-year-old woman who alleged in her application for Disability Benefits that she became disabled on February 3, 2009.  Tr. 16, 31.  Plaintiff previously worked as a certified nurse's assistant ("CNA"), a job that is medium and semi-skilled, according to Andrew Pasternak, the vocational expert ("VE") assigned to Plaintiff's case.  Tr. 62.  Plaintiff was fired from her last CNA position due to an altercation with her boss regarding overtime payments.  Tr. 44.  According to Plaintiff's testimony, she has lost five jobs for yelling at her bosses.  Tr. 57-58.  Since she did not have any positive references, and due to the previous terminations and her temper, Plaintiff was unsuccessful in obtaining work.  Tr. 46.  After she was fired in 2009, Plaintiff testified that her back problems further prevented her from working.  Tr. 47.  Plaintiff testified she first injured her back in 2000, and reinjured it in 2007 and 2009.  Tr. 47.

The medical records indicate that Plaintiff does have some limitations in terms of her back and left hand.  A March 3, 2009, x-ray of Plaintiff's lumbar spine showed

degenerative changes at L4-L5 with disc space narrowing and osteophyte formation, but no fracture. Tr. 403. More than a year later on July 10, 2010, Plaintiff was seen at New York Hospital – Queens ("NYHQ") for intermittent left thumb pain, which radiated to her wrist and forearm, including numbness and tingling. Tr. 227. Upon examination, she was diagnosed with carpal tunnel and trigger finger, with normal range in the wrist and fingers. Id. On August 20, 2010, Plaintiff complained to NYHQ of an abrupt onset pain in her left lumbar that radiated down her left leg after she helped lift someone into the shower. Tr. 229. Upon examination, Plaintiff's left lumbar paraspinal area was tender, and she walked with an antalgic gait; Plaintiff was subsequently diagnosed with sciatica. Tr. 230. Plaintiff's condition was exacerbated in September 1, 2010, when she lifted a patient into bed at work, returning to NYHQ with similar symptoms. Tr. 229, 288. The exam revealed tenderness in the L5-S1 regions and tension on Plaintiff's side. Tr. 289. She was again walking with an antalgic gait, however her back alignment, motor strength, and sensation were all normal. Id.

In October 2010, Plaintiff made several visits to her family practitioner, Dr. Yosef Morad, for lower back pain and weakness (October 8), and pain that radiated down her legs (October 10). Tr. 404. After laser treatments, plaintiff told Dr. Morad she no longer was in pain (October 14), and had continued improvement in her condition (October 17). Id. Six months later in April 2011, Plaintiff complained of pain in her neck, left wrist and arm, and lower back. Tr. 416. A month later, she claimed to have left wrist pain radiating up her arm, and reported having experienced more than ten years of back pain. Tr. 418.

On July 10, 2011, Dr. Morad opined to the State Agency that Plaintiff could perform less than sedentary work. Tr. 301-02. Dr. Morad wrote in his report that Plaintiff

6

could only lift 0-5 pounds occasionally, stand or walk up to two hours a day, and had limitations in pushing and pulling, with no limitations in respect to her sight, posture, and communication skills.  See 294-303.  Dr. Morad made the same assertion three days later in another report to Plaintiff's counsel.  Tr. 318-22.  On September 21, 2011, Plaintiff saw Dr. Louis Tranese for a consultative orthopedic examination.  Tr. 353-59.  Dr. Tranese found that Plaintiff might be restricted in performing repetitive or sustained fine and gross manual activities with her hands.  Id.  He also opined that Plaintiff had minimal restrictions with frequent bending, and had mild to moderate restrictions with heavy lifting.  Id.

### 2. Plaintiff's History of Mental Impairments

During the same time period, Plaintiff also underwent psychiatric exams for depressive symptoms linked to her bipolar disorder.  She had previously attempted suicide roughly 25 years prior to her hearing.  Tr. 392.  Plaintiff underwent a psychiatric examination at NYHQ on August 20, 2010, and again on September 1, 2010.  Tr. 230, 237, 289.  On June 6, 2011, Plaintiff complained to Dr. Morad that she was depressed and Dr. Morad noted that Plaintiff had a history of bipolar disorder.  Tr. 426.  On July 6, 2011, Plaintiff underwent a psychosocial assessment at Long Island Consultation Center ("LICC"), complaining of depression and anger, but claimed no prior mental health treatment despite antidepressants prescribed by Dr. Morad.  Tr. 325-36.  Plaintiff told LICC doctors that she isolated herself, but despite passive thoughts of suicide, she did not want to die.  Tr. 327, 330.  According to the record, Plaintiff's mood and affect seemed depressed, but appropriate.  Tr. 333.  The LICC assigned Plaintiff a global assessment of

7

function ("GAF") score of 50,[1] which meant she had serious symptoms or serious impairment in function. Tr. 333; see American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. txt. rev. 2000) (*DSM-IV-TR*). Upon another assessment two weeks later, Plaintiff's score was raised to 58, indicating she had moderate symptoms or moderate difficulty in functioning. Tr. 397; see *DSM-IV-TR* at 34.

On September 2, 2011, Plaintiff saw Dr. Carl Rosenmann, who found that Plaintiff had no limitation in understanding and remembering. Tr. 345. Separately, Dr. Arlene Broska, during a consultative psychiatric evaluation, posited that Plaintiff could get easily distracted. Dr. Broska, however, concluded that although the Plaintiff's exam results were consistent with psychiatric problems, they did not appear to be significant enough to interfere with Plaintiff's ability to function on a daily basis. Tr. 351. Dr. T. Bruni, a New York State Office of Temporary and Disability Assistance psychologist, saw Plaintiff a month later, finding that she had mild restrictions of activities of daily living, and mild restrictions on concentration, persistence, or pace, with moderate difficulties in terms of social functioning. Tr. 28, 370. Dr. Bruni also found Plaintiff markedly limited in interacting with the general public. Tr. 375.

On August 30, 2012, Plaintiff underwent a psychosocial examination at Medex Diagnostic & Treatment Center ("Medex"), where she appeared to be clean, friendly, and cooperative, demonstrating a normal thought process. Tr. 487. Her GAF was raised to 60,

---

[1] The LICC staff used the DSM-IV multi axial scale for their diagnosis. Axis I deals with clinical disorders (such as bipolar disorder); Axis II deals with personality disorders; Axis III deals with general medical conditions; Axis IV deals with psychosocial and environmental problems; and Axis V deals with the person's GAF. The Court notes that the DSM-IV was supplanted by DSM-5 on May 18, 2013 and no longer uses the multi-axial system. At the time of the examination, however, the multi-axial diagnostic system was widely accepted as the best tool for assessment of mental disorders.

8

indicating she suffered from moderate symptoms or moderate difficulty in functioning.  Tr. 488; see *DSM-IV-TR* at 34.  The following month, Plaintiff complained to Dr. Hamid Moussavian of anxiety, anger, and depression, but noted her medication helped her temper.  Tr. 458.  She told Dr. Moussavian that she was paranoid, heard knocking noises, and feared public transportation.  Tr. 459.  Dr. Moussavian assigned her a GAF score of 55, signifying she had moderate symptoms or moderate difficulty in functioning.  Tr. 501.  Later in the month, Plaintiff told Dr. Moussavian her medications were working well.  Tr. 520.

### C. The ALJ's Decision

In his January 28, 2013, decision, the ALJ first noted that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, February 3, 2009.  Tr. 24.  The ALJ also noted that Plaintiff suffered from the following severe impairments: (1) degenerative disc disease of the cervical and lumbar spine with herniated disc at L4-L5; and (2) mild carpal tunnel syndrome in the left hand and trigger finger.  Tr. 25.  The ALJ found no severe mental impairments.  See Tr. 25.

At step three, the ALJ found that Plaintiff's impairments or a combination thereof did not meet or medically equal the severity of one of the listed impairments.  Tr. 26.  In reaching that decision, the ALJ specifically reviewed the applicable listing 1.00 (musculoskeletal system), finding that the medical record did not indicate any impairment severe enough to meet the criteria of any listed impairment, and those impairments, singly or in combination, did not medically equal the criteria of any listed impairment.  See id.

Next, the ALJ determined Plaintiff's RFC.  The ALJ found Plaintiff capable of performing light work, as defined at 20 C.F.R. §§ 404.1567(b) (2015), 416.967(b), with some limitations, finding Plaintiff able to:

9

> [S]it/stand/walk for a total of six hours in an eight-hour day, with a sit/stand option every fifteen minutes to change position. Plaintiff is capable of lifting/carrying ten pounds on a frequent basis and twenty pounds occasionally. Plaintiff may occasionally climb ramps and stairs, but is precluded from climbing ropes/scaffolds/ladders. Plaintiff may engage in activities that involve occasional balancing, bending, stooping, crouching, crawling and kneeling. Additionally, Plaintiff may occasionally use her left hand and arm to operate hand controls, and to push/pull. There are no limitations with respect to her dominant right hand and arm. Tr. 26, 381.

In determining Plaintiff's RFC, the ALJ weighed Plaintiff's subjective statements against objective medical evidence to find that although the impairments could be reasonably expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. Tr. 27.

At step four, the ALJ found that Plaintiff was not able to perform past relevant work as a certified nursing assistant because the job exceeded Plaintiff's capacity for less than a full range of light work. Tr. 29; see 20 C.F.R. §§ 404.1565, 416.965.

The analysis then moved to step five. The ALJ found that considering Plaintiff's education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform. Tr. 30. Given Plaintiff's RFC to perform light work with some limitations, the VE opined Plaintiff could work as a ticket taker, officer helper, and mailroom clerk. Id. The ALJ next posed a hypothetical whereby the Plaintiff would further be limited to performing simple and complex tasks in a low-stress environment with infrequent contact with supervisors, and frequent contact with other employees. Id. The VE answered that such an individual could perform any of the previously identified jobs. Id. The ALJ then asked the VE whether there were jobs in the national economy for

sedentary, rather than light work.  Id.  The VE answered affirmatively, providing additional jobs such as information aid, and document preparer.  Id.

Based upon the abovementioned RFC determination and the VE's testimony, the ALJ entered a finding of "not disabled."  Tr. 31.

### III. DISCUSSION

#### A. The ALJ's Step Two Determination

Plaintiff argues that the ALJ erred at step two by finding no severe mental impairments.  The Court disagrees.  So long as the ALJ rules in Plaintiff's favor by finding that any single impairment meets the severity threshold required at step two, any error the ALJ makes at step two is harmless error.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 (3d Cir. 2007).  Here, the ALJ found that Plaintiff had severe impairments involving both degenerative disc disease of the cervical and lumbar spine with a herniated disc and carpal tunnel syndrome.  Tr. 25.  Therefore, any error that may have been made regarding the severity of Plaintiff's mental impairments was harmless and thus is not reversible error.

#### B. The ALJ's RFC Determination

As noted above, the ALJ determined that Plaintiff was capable of performing light work with some limitations.  Tr. 26.  Plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence because the ALJ failed to consider or explain the basis for rejecting contrary evidence in the record.

11

An ALJ must consider all pertinent evidence. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). While the ALJ does not need to discuss every piece of evidence included in the record, he must explain his reasons for discounting contradictory evidence. Id. at 122.

### 1. Plaintiff's Subjective Complaints of Pain

Plaintiff argues that the ALJ did not provide a detailed enough credibility analysis of her subjective complaints of pain. In determining whether the claimant is disabled, the ALJ must give consideration to subjective complaints of pain, but the subjective testimony alone will not establish that a claimant is disabled. 20 C.F.R. §§ 404.1529, 416.929; Dorf v. Brown, 794 F.2d 896, 901 (3d Cir. 1986). Plaintiff retains the burden of proving that their complaints of pain are supported by medical evidence. Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995). Where a claimant's subjective testimony as to the pain is reasonably supported by medical evidence, the ALJ cannot discount the claims of pain without contrary medical evidence. Chrupcala v. Heckler, 829 F.2d 1269, 1276 n.10 (3d Cir. 1997).

In the present matter, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but determined that she overstated the intensity, persistence, and limiting effects of those symptoms "for the reasons explained in th[e] decision." Tr. 27. With regards to Plaintiff's back pain, Plaintiff's testimony of her daily activities and range of motion, along with medical evidence, contradicted the severity of the pain. See Tr. 29. Specifically, while the ALJ conceded that Plaintiff could perform light work with some limitations, her back issues were not as severe as Plaintiff claimed. Tr. 294, 301-302, 318-22, 355-56. Further,

12

Plaintiff stated in her testimony, and in several other consultations with both medical and mental health professionals, that her typical day involves walking, shopping, cooking, and watching TV. Tr. 56, 178, 383.

Additionally, there were discrepancies in Plaintiff's mental health testimony and her doctors' opinions. Dr. Rosenmann found that Plaintiff had no limitation in understanding and remembering. Tr. 345. Dr. Broska found that Plaintiff's problems were not significant enough to interfere with Plaintiff's ability to function. Tr. 351. Dr. Bruni found that Plaintiff's largest amount of mental difficulty were in terms of social functioning, due to her affinity to isolate herself. Tr. 310. As for her testimony, Plaintiff stated she tended to stay by herself, but two months later told her mental healthcare provider she would be going to Florida with a friend whom she got along with well. Tr. 59, 479, 516. She also did not account for the fact that she stopped looking for work in 2009 due to her back, but told a healthcare worker that she worked up until at least 2011 as an elderly woman's caretaker. See Tr. 47, 178, 325, 444. Further, she told Dr. Moussavian on two separate occasions that her medication was working well to curb her temper. Tr. 460, 520.

The ALJ appropriately evaluated Plaintiff's subjective complaints of pain. Tr. 29.

### 2. Treating Physician's Opinions

#### a. Physical Limitations

As part of his analysis, the ALJ must consider Plaintiff's treating physicians' opinions. Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994). The opinions of treating

physicians are given substantial, sometimes even controlling weight. 20 C.F.R. §404.1527(d)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). The opinions of treating physicians may be rejected outright only if there is clear contradictory medical evidence. Fouch v. Barnhart, 80 F. App'x 181, 185 (3d Cir. 2003) (citing Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 1999) (quotation omitted)). If there is conflicting medical evidence, the ALJ is allowed to choose which source to credit so long as he considers all of the evidence and provides some reason for discounting the evidence rejected. Fouch, 225 F. 3d at 317. Additionally, disability determinations are reserved to the Commissioner of the Social Security Administration; statements by doctors of medical experts that Plaintiff is disabled do not override the conclusions the Commissioner is legally authorized to make, nor do they guarantee or necessitate a finding of disability. 20 C.F.R. § 404.1527(d)(2).

Plaintiff asserts that the ALJ erred in assigning some weight to the opinions of Dr. Morad, her family doctor, and Dr. Tranese, the consultative orthopedic examiner, arguing that the ALJ's conclusions were not consistent with the doctors' opinions. The Court finds these arguments to be without merit.

First, Plaintiff rests her argument on the premise that the RFC assessment must be based on a medical opinion, however, the RFC is an administrative finding reserved to the ALJ. 20 C.F.R. § 404.1456(c) (2015) ("Although we consider opinions from medical sources on issues such as [RFC] the final responsibility for deciding these issues is reserved to the Commissioner"); see Brown v. Astrue, 649 F.3d 193, n.2 (3d Cir. 2011) ("The law is clear, however, that the opinion of a treating physician does not bind the ALJ on the issue of function capacity.") Here, the ALJ explained his decision to not wholly adopt

14

Plaintiff's treating physicians' opinions was due to "recent objective findings," including Plaintiff's spinal x-rays, the Doppler test, as well as clinical findings made concerning her range of motion, and the testimony concerning her daily activities. Tr. 29. Using all of this evidence, the ALJ came to the conclusion that Plaintiff was capable of performing light work with the physical limitations noted in the RFC. Tr. 29.

The ALJ cited specific reasons to support his determination, including the Plaintiff's subjective testimony that her daily activities entail showering without assistance, walking, shopping, and cooking. Tr. 56. Plaintiff is able to feed herself and bathe herself, with some difficulty putting her socks on. Id. Further, Plaintiff continued to work after her alleged disability onset date of February 3, 2009. Tr. 288, 325, 444, 453; see 20 C.F.R. § 404.1571 (2015).[2]

Dr. Morad's opinions were only given some weight because the record evidence showed a finding that Plaintiff could perform a reduced range of light work, not the "less than sedentary" work opined by Dr. Morad. Tr. 26, 29, 301-02, 318-22. As previously discussed, Plaintiff's own testimony negated Dr. Morad's opinion, as an individual who could not perform even sedentary work would not be able to perform her daily activities. Tr. 56; see 20 C.F.R. § 404.1567. Discrediting Dr. Morad's opinion further, the only diagnostic testing cited by his reports was an MRI from November 2007, showing disc pressure on the neural foramina, and an x-ray of the lumbar spine from March 2009, showing only degenerative disc changes at L4-L5, with disc space narrowing and osteophyte formation, with no other performed, ordered or updated studies done by him.

---

[2] Upon remand, the Commissioner should also address whether the Plaintiff's application may be denied at step one.

15

Tr. 28. Both tests were done prior to the alleged onset disability date of February 9, 2009. Tr. 116. An x-ray performed on September 26, 2011, by IMA Disability Services of Plaintiff's lumbosacral spine, showed only degenerative disc disease at L4-L5, and no compression fracture. Tr. 357. A cervical spine x-ray done on the same date showed degenerative spondylosis at C5-C6, straightening, and no compression fracture, again, indicating normal age-related degenerative changes. Tr. 358. Additionally, Dr. Morad's suspected diagnosis of deep vein thrombosis was negated by the Doppler ultrasound test. Tr. 28-29.[3]

For the above reasons, the ALJ properly evaluated Plaintiff's physical limitations.

### b. Mental Limitations

As for her mental RFC, Plaintiff argues that none of the medical opinions purportedly given weight by the ALJ in fact demonstrate she has work-related mental limitations. The Court agrees in part.

First, Plaintiff argues that even though Dr. Arlene Broska was given significant weight by the ALJ, the ALJ failed to account for any of the limitations described by her. This argument is without merit. Dr. Broska diagnosed Plaintiff with bipolar disorder, and suggested that Plaintiff has potential difficulties handling stress, making decisions in the workplace, and being easily distracted. Tr. 28; see 349-51. However, Dr. Broska found that while the results of the evaluation appeared to be consistent with psychiatric problems, they did not appear to be significant enough to interfere with Plaintiff's daily functioning.

---

[3] The Court also finds that ALJ's RFC was consistent with Dr. Tranese's treatment records, as nothing Dr. Tranese posited was contradictory to the ALJ's final decision. Tr. 29, 355-65.

Tr. 351. The ALJ posited that Dr. Broska's opinions were supported by Plaintiff's daily activities and minimal psychiatric intervention. Tr. 28.

Second, Plaintiff argues that the ALJ failed to account for the opinions from treating psychiatrist Dr. Carl Rosenmann altogether. However, Dr. Rosenmann's opinions were given some weight. See Tr. 29. He described Plaintiff as having erratic mood and behavior, but found her anger and depression controllable. Tr. 345-46. Plaintiff told Dr. Rosenmann on August 11, 2011, that it was the first time in several years she felt able to control her anger, and that she felt control of herself again. Tr. 343. Dr. Rosenmann was unable to say if Plaintiff's mental health issues would be long-term, and could not provide a medical opinion regarding Plaintiff's ability to do work related activities. Tr. 346. Plaintiff's GAF scores were also evaluated by the ALJ, and her last score of 55 indicated that she had moderate symptoms and moderate difficulty functioning. See Tr. 333, 463. Clearly, as she told Dr. Moussavian, her medications were working, helping to curb her anger, depression, and anxiety. Tr. 520.

Lastly, Plaintiff argues that while the ALJ gave Dr. T. Bruni's opinion "great weight," the ALJ overlooked Plaintiff's particular limitations described by this doctor. The Court agrees. The ALJ did properly consider Dr. Bruni's observation, that Plaintiff had mild limitations of activities of daily living, mild restrictions in terms of concentration, perseverance, or pace, moderate restrictions of social functioning, and noted episodes of decompensation. Tr. 370.

Nonetheless, the ALJ failed to adopt, or contradict, Dr. Bruni's findings that Plaintiff has a marked limitation in interacting with the general public, a limitation that could have impacted her RFC. See Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000),

17

Santiago v. Comm'r of Soc. Sec., No. 13-1464, 2014 WL 4793448, at *12 (E.D.N.Y. 2014), Velazquez v. Barnhart, No. 02-1264, 2004 WL 367614, at *10 (D. Conn. 2004); see also Tr. 29, 67-68, 375.  An ALJ must consider all pertinent evidence.  Burnett, 220 F.3d at 121.  While the ALJ does not need to discuss every piece of evidence included in the record, he must explain his reasons for discounting contradictory evidence.  Id. at 122.  Therefore, because the Court is left unable to determine if the ALJ failed to consider, or considered and rejected this marked limitation, the matter is remanded to the ALJ for further consideration consistent with this opinion.

### IV. CONCLUSION

Because the Court is unable to conduct meaningful judicial review, the Commissioner's disability determination is **REMANDED**.  An appropriate order will follow.

> s/ *Madeline Cox Arleo*
> **MADELINE COX ARLEO**
> **UNITED STATES DISTRICT JUDGE**